| | | |
|---|---|---|
| **CHARLES FIESER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:08CV1926 DJS(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Charles Fieser for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b).  Plaintiff has filed a Brief in Support of the Complaint.  (Document Number 18).  Defendant has filed a Brief in Support of the Answer.  (Doc. No. 24).

**Procedural History**

On April 11, 2005, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on December 31, 1998.  (Tr. 101-03, 107-09).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated February 27, 2007.  (Tr. 37, 24-

35).  On April 23, 2007, the Appeals Council of the Social Security Administration (SSA) vacated the ALJ's decision and remanded the case back to an ALJ for further consideration.  (Tr. 20-23).  On November 20, 2007, after an administrative hearing, an ALJ issued a new decision finding that plaintiff was not entitled to benefits.  (Tr. 7-19).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council, which was denied on October 27, 2008.  (Tr. 6, 2-3A).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on October 31, 2007.  (Tr. 563).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Dr. John McGowan.  (Id.).  The ALJ began the hearing by admitting a number of exhibits into the record.  (Tr. 21).

The ALJ then examined plaintiff, who testified that he was forty-seven years of age.  (Id.).  Plaintiff stated that he attended school until the twelfth grade but did not graduate.  (Id.).  Plaintiff testified that he later obtained his GED.  (Id.).

Plaintiff stated that he worked as a machine operator in the past, at which time he had his best income.  (Id.).  Plaintiff testified that he also worked as a carpenter and a framer on a part-time or seasonal basis.  (Id.).  Plaintiff stated that he last worked in 1998 or 1999.  (Id.).

Plaintiff testified that he stopped working because he injured his ankle and the pain was so severe that he was unable to stand on it.  (Id.).  Plaintiff stated that he injured his ankle in 1996.  (Tr. 565).  Plaintiff testified that he tried to work for a few years after his injury but he struggled.

(Id.).  Plaintiff stated that he did not receive any medical treatment for his ankle at the time the injury occurred because he did not realize the severity of the injury.  (Id.).  Plaintiff testified that he sought medical treatment when he stopped working in 1998 but he was told that there was nothing they could do about it.  (Id.).

Plaintiff stated that he had a problem with alcohol in the past.  (Id.).  Plaintiff testified that it has been a couple years since he has had problems with alcohol.  (Id.).  Plaintiff stated that, at the time of the hearing, he drank alcohol socially.  (Id.).  Plaintiff testified that he went through a detox program in 2000.  (Id.).

Plaintiff stated that he was admitted at the Metropolitan St. Louis Psychiatric Center in 2001 due to family problems related to alcohol.  (Tr. 566).  Plaintiff testified that he was admitted at the Psychiatric Center again in 2005 due to family problems and alcohol.  (Id.).  Plaintiff stated that he did not go to rehab after his release from the Psychiatric Center.  (Id.).  Plaintiff testified that alcohol ceased being a problem for him after this admission.  (Id.).  Plaintiff stated that he has not been admitted to any psychiatric hospitals nor has he been treated by a psychiatrist or psychologist since that time.  (Id.).

Plaintiff testified that he has constant pain in his right ankle.  (Tr. 567).  Plaintiff stated that the more he stands on his right ankle, the more it swells and causes pain.  (Id.).  Plaintiff testified that the pain shoots up his leg.  (Id.).

Plaintiff stated that he experiences pain in his hands due to previous injuries.  (Id.).  Plaintiff testified that he has injured his fingers, wrists and elbows, and he has arthritis.  (Id.).  Plaintiff stated that his hands do not function properly.  (Id.).  Plaintiff testified that his left elbow swells and occasionally locks.  (Id.).  Plaintiff stated that he has nerve damage in his left hand and

two of his fingers.  (Tr. 568).  Plaintiff testified that the middle finger of his left hand was crushed in a work accident.  (Id.).  Plaintiff stated that he lost the tip of his right index finger a few years prior to the hearing due to an infection.  (Id.).  Plaintiff testified that none of his fingers function properly.  (Id.).  Plaintiff stated that he has never undergone an EMG or nerve conduction studies but he has undergone x-rays.  (Id.).

Plaintiff testified that he had pneumonia[1] earlier in the year, which resolved.  (Id.).  Plaintiff stated that he smokes just under a package of cigarettes a day.  (Tr. 569).

Plaintiff testified that he is unable to work due to his old physical injuries, arthritis, HIV, and the side effects of medication he takes for the HIV.  (Id.).  Plaintiff stated that his HIV medication makes him tired, weak, dizzy, nervous, and shaky.  (Id.).  Plaintiff testified that he is constantly tired and he is unable to concentrate.  (Id.).  Plaintiff stated that, at the time of the hearing, he was only HIV-positive and did not have AIDS.  (Id.).  Plaintiff testified that his doctors told him that he would not be alive if he were not taking his HIV medication.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that the HIV medications that cause the side effects he described are Sustiva[2] and Truvada.[3]  (Tr. 570).  Plaintiff stated that he also took a blood pressure medication that caused him to feel nervous, shaky, and weak.  (Id.).  Plaintiff testified that when he is dizzy, his balance is affected and it is difficult for him to walk.

---

[1]Inflammation of the lung characterized by consolidation of the affected part, the alveolar air spaces being filled with exudate, inflammatory cells, and fibrin.  See Stedman's Medical Dictionary, 1523-24 (28th Ed. 2006).

[2]Sustiva is an antiretroviral agent indicated for the treatment of HIV-1 infection.  See Physician's Desk Reference (PDR), 1070 (59th Ed. 2005).

[3]Truvada is an antiretroviral agent indicated for the treatment of HIV-1 infection.  See PDR at 1377.

(Id.).  Plaintiff stated that it is especially difficult for him to walk due to his ankle pain and swelling.  (Id.).  Plaintiff testified that he is able to get around his house by stopping to rest when he feels dizzy.  (Id.).  Plaintiff stated that he experiences the most difficulty with dizziness when he changes position from sitting to standing or when he turns.  (Id.).

Plaintiff testified that he has difficulty concentrating.  (Id.).  Plaintiff stated that he used to enjoy singing and now he has trouble remembering the words to songs.  (Id.).  Plaintiff testified that his mind wanders from one thing to another.  (Id.).  Plaintiff stated that he has difficulty staying awake.  (Tr. 571).

Plaintiff testified that he spends about half of each day in bed.  (Id.).  Plaintiff stated that he stays in bed due to pain, fatigue, and weakness.  (Id.).  Plaintiff testified that these symptoms are either from his HIV, the HIV medication, or a combination of both.  (Id.).

Plaintiff stated that he lost his Medicaid coverage in February or April of 2007.  (Id.).  Plaintiff testified that Medicaid determined that he was not disabled.  (Id.).  Plaintiff stated that he appealed this decision and his appeal was denied after a hearing.  (Tr. 572).  Plaintiff testified that he is only able to receive treatment through the JFK clinic at St. John's.  (Id.).  Plaintiff stated that his HIV doctor referred him to this clinic.  (Id.).  Plaintiff testified that he was without his HIV medication for a month before he started treatment at the clinic.  (Id.).

Plaintiff testified that he has experienced depression due to his health and his family situation.  (Id.).  Plaintiff stated that he has symptoms of fatigue, anxiety, and crying spells.  (Tr. 573).  Plaintiff testified that he experiences crying spells a couple times a week.  (Id.).  Plaintiff stated that he is not suicidal or homicidal.  (Id.).  Plaintiff testified that he changes clothes and bathes daily.  (Id.).  Plaintiff stated that he has not experienced any changes in his appetite.  (Id.).

Plaintiff testified that he has no interest in any activities anymore. (Id.). Plaintiff stated that he does not sleep well. (Id.). Plaintiff testified that he has difficulty getting to sleep and he wakes up during the night due to pain. (Id.). Plaintiff stated that he usually sleeps five to six hours a night. (Id.).

Plaintiff testified that he is able to stand on his ankle for about half of an hour before he has to sit down due to pain. (Tr. 574). Plaintiff stated that his pain is the same whether he is standing or walking. (Id.). Plaintiff testified that he is unable to sit comfortably because he is nervous and he is always moving around. (Id.).

Plaintiff stated that he has difficulty grasping, especially with his left hand. (Id.). Plaintiff testified that objects such as cups, plates, and bowls frequently slip out of his hand. (Id.). Plaintiff stated that he also has difficulty fastening buttons. (Id.).

Plaintiff testified that he has had pneumonia over and over due to his HIV and he never knows when he will get sick or how bad the illness will be. (Id.). Plaintiff stated that he uses an inhaler two to three times a day. (Tr. 575).

The ALJ then examined vocational expert Dr. John McGowan. (Id.). The ALJ asked Dr. McGowan to assume a hypothetical claimant, aged 44 at the alleged date of onset, with a GED, the same past work experience as plaintiff and with the following limitations: lift and carry up to twenty pounds occasionally, ten pounds frequently; stand or walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; can occasionally climb stairs and ramps; can never climb ropes, ladders, and scaffolds; and should avoid concentrated exposure to extreme cold, vibration, and the hazards of unprotected heights. (Id.). Dr. McGowan testified that such an individual could not return to any of plaintiff's past work. (Id.). Dr. McGowan

clarified that he could not use plaintiff's work as a crane operator because it occurred more than fifteen years prior to the hearing. (Tr. 576). Dr. McGowan stated that, since 1994, plaintiff worked at positions that were heavy in exertion but did not constitute substantial gainful activity. (Id.). Dr. McGowan testified that there are no jobs plaintiff had in the past that he could use. (Id.).

Dr. McGowan stated that there would be other light work that the hypothetical claimant could perform. (Id.). Dr. McGowan testified that the individual could perform security work such as gate guard, of which 1,200 positions exist in Missouri and 65,000 nationally. (Tr. 577). Dr. McGowan stated that the individual could also work as a fast food worker, of which 21,400 positions exist in Missouri and 500,000 nationally. (Id.).

The ALJ next asked Dr. McGowan to assume a hypothetical claimant who could lift and carry up to ten pounds occasionally and less than ten pounds frequently; stand or walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; and should avoid concentrated exposure to extreme cold and vibration. (Id.). Dr. McGowan testified that such an individual could not perform any of plaintiff's past relevant work. (Id.). Dr. McGowan stated that the individual could perform sedentary positions such as security systems monitor (2,000 in Missouri;100,000 nationally); information clerk (200 in Missouri; 16,000 nationally); and garment industry positions (21,000 in Missouri; 385,000 nationally).

Dr. McGowan testified that, if plaintiff's testimony is fully credited, there would be no jobs that he would be capable of performing with his limitations. (Tr. 579). Dr. McGowan stated that plaintiff's fatigue would cause the most difficulties. (Id.). Dr. McGowan testified that plaintiff's depression, lack of concentration, lack of energy, fatigue, weakness, shakiness, and

history of multiple injuries would also affect plaintiff's ability to work.  (Id.).

**B.     Relevant Medical Records**

The record reveals that plaintiff presented to St. John's Mercy Hospital on June 4, 1999, with complaints of right foot pain.  (Tr. 518).  X-rays of plaintiff's foot were negative.  (Id.).  Plaintiff became very upset when told about the negative x-ray and became very disparaging, using profanities.  (Id.).  Plaintiff was diagnosed with soft tissue injury of the right foot and personality disorder.[4]  (Id.).

Plaintiff also presented to Des Peres Hospital on June 4, 1999, with complaints of right ankle pain.  (Tr. 530-535).  X-rays revealed no acute bony abnormality, with evidence of old trauma.  (Tr. 535).  Plaintiff was diagnosed with right foot injury/strain and acute bronchitis.[5]  (Tr. 531).

Plaintiff presented to the emergency room at St. John' Mercy Hospital on January 15, 2000, with complaints of a progressive respiratory infection.  (Tr. 508).  Plaintiff was diagnosed with acute bacterial pneumonia,[6] bronchitis due to cigarettes smoking, and oral herpes simplex virus.[7]  (Id.).  Plaintiff was discharged on January 19, 2000, with instructions to follow-up with his physician in one week.  (Id.).

---

[4]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and interpersonal functioning.  See Stedman's at 570.

[5]Inflammation of the mucous membrane of the bronchi.  See Stedman's at 270.

[6]Infection of the lung with any of a large variety of bacteria.  See Stedman's at 1524.

[7]A variety of infections caused by herpesvirus types 1 and 2; type 1 infections are marked most commonly by the eruption of one or more groups of vesicles on the vermilion border of the lips or at the external nares, type 2 by such lesions on the genitalia; both types often reappear during other febrile illnesses or even physiologic states such as menstruation.  See Stedman's at 882.

Plaintiff presented to Richard B. Buckles, D.O. on May 18, 2000, for a consultative examination. (Tr. 527-28). Plaintiff's major complaint was pain and weakness of his right foot and ankle due to an accident three years prior. (Tr. 527). Plaintiff complained of constant pain in his right foot and ankle, with grinding and popping of his ankle with any type of ambulation. (Id.). Plaintiff reported that he was unable to walk or stand longer than fifteen minutes. (Id.). Plaintiff was not taking any medication to help with this problem. (Id.). Upon examination, plaintiff walked with a limp due to weakness and tenderness of the right ankle and foot region. (Tr. 528). Dr. Buckles noted that plaintiff was very flat footed and had a significant amount of inversion of the ankles and feet. (Id.). Palpation of the right ankle and foot revealed tenderness. (Id.). No swelling was noted. (Id.). Plaintiff was unable to walk on his heels or toes and it was very difficult for him to squat due to pain in his right ankle and foot. (Id.). Plaintiff had no problem getting on and off the exam table. (Id.). No other muscle atrophy or joint deformity was observed. (Id.). Dr. Buckles' impression was status post injury to the right ankle with persistent pain and weakness; flat feet; significant inversion of the right ankle; and hypertension. (Id.).

Plaintiff was admitted to the Metropolitan St. Louis Psychiatric Center on May 25, 2001, on a 96-hour involuntary, court-ordered detention from Franklin County. (Tr. 321). Plaintiff's parents reported that plaintiff was grandiose, bizarre, and paranoid, stating that he was Jesus Christ and the chosen one. (Id.). Plaintiff's parents also indicated that plaintiff had been up all night and had been threatening to his mother. (Id.). Upon admission, plaintiff appeared to be slightly disheveled, somewhat loud, irritable, with a wide range of affect, and no psychosis. (Id.). Throughout his stay, plaintiff was found to be entirely appropriate, reality based, and without any evidence of lability, assaultiveness, or aggression, and he constantly denied any special role or powers. (Tr. 322). Upon

discharge, plaintiff was found to be fully alert and oriented, with no pervasive mood symptoms, and no evidence of any psychosis. (Id.). Plaintiff was not given an Axis II diagnosis but it was found that plaintiff had severe psychosocial or environmental factors and a GAF score[8] of 70.[9] (Id.).

Plaintiff presented to St. John's Mercy Hospital on March 27, 2004, with complaints of a fever and bilateral chest pain. (Tr. 505). It was noted that plaintiff was HIV-positive.[10] (Id.). Plaintiff reported smoking half a package of cigarettes a day and drinking alcohol. (Id.). Plaintiff was diagnosed with left middle lobe pneumonia, chronic obstructive pulmonary disease (COPD),[11] HIV positive, and oral thrush. (Tr. 506). Plaintiff was prescribed medication and it was recommended that he get into an HIV clinic as soon as possible for further evaluation and treatment. (Id.).

Plaintiff presented to B.J. Kerbyson, D.O. on April 14, 2004, for an Internal Medicine

---

[8]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[9]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

[10]Abbreviation for human immunodeficiency virus-1. The typical course of HIV infection without treatment: during early period after primary infection, there is widespread dissemination of virus and a sharp decrease in number of CD4 T cells in peripheral blood; an immune response to HIV ensues, with a decrease in detectable viremia followed by a prolonged period of clinical latency; sensitive assays for viral RNA show that virus is present in plasma at all times; CD4 T-cell count continues to decrease during following years until it reaches a critical level below which there is a substantial risk of opportunistic diseases. See Stedman's at 894.

[11]General term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. See Stedman's at 554.

Examination in connection with his application for benefits. (Tr. 495-503). Plaintiff complained of redness, warmth, tenderness, and swelling of the right ankle for eight years. (Tr. 496). Upon examination, plaintiff ambulated with a normal gait, which was not unsteady and plaintiff appeared stable at station and comfortable in the supine and sitting positions. (Tr. 497). Plaintiff's intellectual functioning appeared normal. (Id.). Slight bilateral wheezing was noted in the lungs, with no rales or rhonchi. (Id.). No shortness of breath was noted. (Id.). Examination of the hands revealed no tenderness and full grip strength. (Tr. 498). Examination of the lower extremities revealed mild tenderness of the right ankle of which there was a deformity consistent with plaintiff's history of an untreated fracture in about 1996. (Id.). No redness, warmth, or swelling was noted. (Id.). Plaintiff had full range of motion of the right ankle. (Id.). Plaintiff refused to stand on his right leg alone due to right ankle pain. (Id.). Plaintiff was able to walk on his toes, but was unable to walk on the heels due to complaints of right ankle pain. (Tr. 499). Plaintiff was able to perform tandem gait and squat without difficulty. (Id.). Dr. Kerbyson noted that x-rays of the right ankle and foot revealed arthritic changes and previous trauma. (Id.). Dr. Kerbyson's impression was history of HIV positive; and chronic right ankle pain, status post untreated fracture about 1996. (Id.).

Plaintiff presented to Saint Louis ConnectCare on April 26, 2004, with complaints of right foot and ankle pain. (Tr. 485). Plaintiff reported that he was treated for pneumonia at St. John's three weeks prior. (Id.). Upon examination, wheezing was noted in plaintiff's lungs. (Id.). Plaintiff complained of fatigue. (Tr. 486). Plaintiff also complained of chronic numbness in his left hand. (Id.). Plaintiff was diagnosed with asymptomatic HIV, hypertension, history of right ankle fracture, and chronic pain. (Tr. 487).

Plaintiff presented to St. Louis ConnectCare on September 16, 2004, for a follow-up

regarding his HIV. (Tr. 479). Plaintiff reported that he had stopped his HIV medications because he was extremely sleepy and had difficulty concentrating. (Id.). Plaintiff was instructed to restart his medications. (Tr. 480).

Plaintiff was admitted to St. Luke's Hospital on September 28, 2004, with a diagnosis of HIV-positive and pneumonia. (Tr. 459). Plaintiff was examined by Matthew L. German, M.D. on September 29, 2004. (Tr. 456-57). Plaintiff complained of respiratory symptoms, fever and chills, diffuse arthralgias, headache, and subjective neck stiffness. (Tr. 456). Plaintiff reported smoking less than a package of cigarettes a day and drinking a substantial amount of alcohol. (Id.). Dr. German's impression was history of febrile illness, now afebrile with normal white count, respiratory symptoms in a patient with HIV and smoker, probable COPD, diffuse arthralgias. (Tr. 457). Dr. German stated that plaintiff may have had a viral infection with exacerbation of underlying COPD. (Id.). Dr. German noted that plaintiff's arthralgias appear to be somewhat chronic in nature and that plaintiff had some puffiness around the left elbow on examination, which was suggestive of possible inflammation or fluid. (Id.). Dr. German recommended that plaintiff be treated with nebulizers and Zithromax.[12] (Id.). He indicated that he would look for rheumatologic problems including rheumatoid arthritis. (Id.).

Plaintiff underwent an x-ray of the left elbow on September 29, 2004, which revealed mild osteoarthritis.[13] (Tr. 470). X-rays of the left hand revealed no erosive arthropathy or soft tissue

---

[12]Zithromax is indicated for the treatment of patients with mild to moderate infections. See PDR at 2673.

[13]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints. See Stedman's at 1388.

swelling. (Tr. 471). X-rays of the right hand revealed no significant periarticular osteopenia or evidence of inflammatory or erosive arthropathy. (Tr. 472). X-rays of the bilateral wrists were unremarkable. (Tr. 473-74). X-rays of the lungs revealed a small infiltrate in the right upper lobe. (Tr. 476). X-rays of the ankle revealed an old injury with secondary osteoarthritis. (Tr. 477).

Plaintiff was admitted to Metropolitan St. Louis Psychiatric Center on February 24, 2005, as a result of a court order. (Tr. 220). Plaintiff's family indicated that plaintiff had been suicidal, paranoid, and bizarre. (Id.). Affidavits by plaintiff's family members also stated that plaintiff has a significant problem with alcohol and whenever he is intoxicated, he becomes agitated and paranoid. (Id.). Plaintiff denied his family's allegations. (Id.). Throughout his hospitalization, plaintiff remained irritable, especially when talking about his alcohol problem, but overall displayed no evidence of any acute psychosis. (Tr. 222). Plaintiff exhibited no neurovegetative signs of depression and did not express any thoughts of hurting himself or anybody else throughout the hospitalization. (Id.). Plaintiff was discharged on March 4, 2005. (Id.). Plaintiff's discharge diagnoses were alcohol dependence, marijuana abuse, and personality disorder with antisocial traits, with a GAF score of 60.[14] (Id.). It was recommended that plaintiff attend substance abuse counseling and obtain and maintain sobriety. (Id.).

Plaintiff presented to Stanley London, M.D. for a consultative examination on July 28, 2005. (Tr. 435-36). Plaintiff complained of pain and swelling in his right foot and ankle. (Tr. 435). Dr. London noted that plaintiff was not good at providing details about his complaints and that he continued to add things that occurred in the past. (Tr. 436). Upon physical examination, some

_____

[14] A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

thickening of the ankle on the right side with some pes planus[15] was noted. (Id.). Dr. London stated

that there was an obvious deformity of the right ankle and that plaintiff walked with a limp, favoring

his right ankle. (Id.). Plaintiff was unable to heel or toe walk or hop on his right leg. (Id.).

Squatting was difficult for plaintiff. (Id.). Plaintiff's finger control was good, except in those areas

where he has had partial amputations and in his left hand where there is some numbness and tingling

in the thumb and index finger. (Id.). Some loss of bulk in the right calf and limitation of motion of

the right ankle was noted. (Id.). There was some splaying of the ankle and the foot with general

thickening in the ankle area. (Id.). Dr. London did not feel any crepitation and indicated that the

ankle felt stable. (Id.). Dr. London's impression was old injury to the right ankle, possible old

fracture, possible dislocation, possible diathesis[16] of the tibia and fibula in that area; and history of

multiple fractures and dislocations related to wrists, tendon injury to his left wrist and a fractured

collarbone in the past. (Id.).

Laboratory testing from August 12, 2005 revealed a CD4 count of 445, with the reference

range being 490 to 1740.[17] (Tr. 440).

Plaintiff presented to St. John's Clinic in Steelville on January 10, 2006. (Tr. 426). Plaintiff

---

[15]A condition in which the longitudinal arch is broken down, the entire sole touching the ground. Stedman's at 1468.

[16]The constitutional or inborn state disposing to a disease, group of diseases, or metabolic or structural anomaly. Stedman's at 535.

[17]The primary targets of HIV are cells with the CD4 surface protein. Gradual decline in the CD4 count, typically occurring over a period of 10 to 12 years, culminates in loss of ability to resist opportunistic infections. The appearance of one or more of these infections defines the onset of AIDS. Common clinical features of HIV-infected patients with a CD4 cell count of 150 to 500 include oral and vaginal candidiasis, sinusitis, gingivitis, seborrheic dermatitis, psoriasis, warts, recurrent herpes simplex infection, tuberculosis, fever, sweats, and weight loss. See Stedman's at 40, 895.

was diagnosed with pneumonia, chronic bronchitis, and HIV. (Tr. 427).

Plaintiff presented to St. John's Clinic on January 26, 2006, at which time he was diagnosed with pneumonia, resolved; depression with anxiety; and HIV. (Tr. 424).

Plaintiff presented to David A. Janssen, M.D. on March 31, 2006, for treatment of his HIV. (Tr. 411). Plaintiff reported that he was diagnosed as HIV positive in the fall of 2003. (Id.). Plaintiff admitted that, due to social circumstances, jail time, and non-compliance, he had only been on HIV medications for a total of four months. (Id.). Plaintiff had been off his HIV medications for about a year. (Id.). Plaintiff reported that he felt pretty good overall, although he complained of occasional fatigue. (Id.). Upon physical examination, Dr. Janssen found no cyanosis,[18] clubbing or edema. (Tr. 412). Dr. Janssen's impression was HIV infection, sporadic treatment making presence of multiple resistance markers highly likely, health at the present time seems to be good, unimpressive blood work; history of tobacco use/abuse; depression/anxiety; and extremely poor social situation. (Id.). He recommended additional testing and did not start plaintiff on HIV medications. (Tr. 413). Dr. Janssen stated that plaintiff's history and social situation did not engender confidence in plaintiff's ability to be compliant in the future. (Id.).

Plaintiff underwent laboratory testing on March 31, 2006, which revealed a CD4 count of 338, which was outside the normal range of 400 to 1600. (Tr. 418).

Plaintiff presented to Dr. Janssen on May 5, 2006, at which time he reported he was doing fine. (Tr. 410). Plaintiff complained of bilateral armpit swelling and pain. (Id.). Plaintiff's CD4 was 338. (Id.).

---

[18]A dark bluish or purplish discoloration of the skin and mucous membrane due to deficient oxygenation of the blood, evident when reduced hemoglobin in the blood exceeds 5 g/100 mL. Stedman's at 475.

Plaintiff presented to Dr. Janssen on August 4, 2006, at which time he was treated for HIV, routine health maintenance and immunizations, and hypertension. (Tr. 408). Dr. Janssen noted that plaintiff had been on HIV medications for three months. (Id.). Plaintiff indicated that he was doing fine and reported no side effects from the HIV medication. (Id.).

Plaintiff presented to the emergency room at St. John's Mercy Hospital on May 14, 2007, with complaints of chest pain, back pain, chills, fever, body aches, and cough. (Tr. 203). The examining physician noted that plaintiff's CD4 had most recently been above 600. (Id.). Plaintiff reported that he had been out of his HIV medication for about three weeks and started them again that day. (Id.). Plaintiff was diagnosed with pneumonia. (Tr. 204). He was given ibuprofen, Vicodin,[19] Rocephin[20] and Zithromax. (Id.). Plaintiff felt better after receiving medication and was discharged the same day. (Id.).

Plaintiff presented to St. John's Mercy Medical Center on June 13, 2007, to establish care. (Tr. 185). Plaintiff complained of joint pains. (Id.). Plaintiff was noted to have wheezing, cough, frequent pulmonary infections, hypertension, and sinusitis. (Tr. 187-88). Plaintiff also had joint pain, swelling, stiffness, and trauma to the joints. (Tr. 189). It was noted that plaintiff was prescribed a Combivent inhaler[21] for his COPD. (Tr. 182).

On June 13, 2007, plaintiff underwent x-rays of the left elbow, which revealed mild

---

[19]Vicodin is indicated for the relief of moderate to moderately severe pain. See PDR at 526.

[20]Rocephin is indicated for the treatment of bacterial infections. See PDR at 2916.

[21]A Combivent inhaler is indicated in patents with COPD on a regular aerosol bronchodilator who continue to have evidence of bronchospasm and who require a second bronchodilator. See PDR at 992.

osteoarthritis of the left elbow and a possible loose body. (Tr. 193). X-rays of the left wrist revealed evidence of prior trauma. (Tr. 194). X-rays of the right elbow were unremarkable. (Tr. 195). X-rays of the left hand revealed no acute fracture or radiographic evidence of arthritis. (Tr. 196). X-rays of the right ankle were negative, revealing no fracture, dislocation, focal bone production or destruction. (Tr. 197). X-rays of the right wrist revealed mild spurring and subchondral cyst formation. (Tr. 198). X-rays of the right hand revealed no fracture but mild spurring of the third metacarpal phalangeal joint. (Tr. 199).

### The ALJ's Determination

The ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR § 416.920(b) and 416.971 et seq.)

2.  The claimant has the following severe impairments: a history of ankle trauma, HIV+ and mild osteoarthritis of the hands, wrists and left elbow (20 C.F.R. § 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to stand and walk 6 of 8 work hours, sit 6 of 8 work hours, to lift and carry up to 20 pounds occasionally and 10 pounds frequently, to occasionally climb stairs and ramps but never ropes, scaffolds and ladders, and he must avoid concentrated exposure to extreme cold, hazardous heights and vibration.

5.  The claimant cannot perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on August 1, 1960 and is a younger individual (20 CFR 416.963).

7.  The claimant has a high school education and communicates in English (20 CFR 416.964).

8.       There is no evidence documenting transferable skills (20 CFR 416.968).

9.       Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time since April 11, 2005 through the date of this decision (20 CFR 416.920(g)).

(Tr. 12-19).

The ALJ's final decision reads as follows:

> Based on the application for supplemental security income filed on April 11, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 19).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.     Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional

capacity.  Plaintiff next contends that the ALJ erred in assessing the credibility of plaintiff's

subjective complaints of pain and limitations.  Plaintiff finally argues that the hypothetical question

presented to the vocational expert was flawed.  The undersigned will discuss plaintiff's claims in

turn, beginning with the ALJ's credibility assessment.

**1.    Credibility Assessment**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole.  "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work."  Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant

inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ properly pointed out <u>Polaski</u> factors and other inconsistencies in the record that detract from plaintiff's complaints of disabling pain. (Tr. 13-17). The ALJ first stated that plaintiff had a normal appearance and demeanor at the hearing and that he did not appear to be in any physical or emotional distress. (Tr. 14). The ALJ noted that plaintiff answered questions intelligently and coherently and maintained his concentration. (<u>Id.</u>). The ALJ stated that plaintiff did not appear to be distracted by pain or other symptoms. (<u>Id.</u>). It is "completely proper" for an ALJ to consider the claimant's demeanor during the hearing in making credibility determinations. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

The ALJ next found that the objective medical evidence is not supportive of plaintiff's allegations of disability. (Tr. 16). The ALJ noted that despite's plaintiff's testimony that he has had pneumonia one time after another, over the past few years he only had it once in 2006 and once in 2007. (Tr. 16, 427, 204). The ALJ pointed out that plaintiff complained of side effects from HIV therapy, however the treatment notes show that he reported no side effects and in a recent treatment note he denied weakness, fatigue, and dizziness. (Tr. 16, 408). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. <u>See</u> <u>Curran-Kicksey v. Barnhart</u>, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ further noted that there are no reports from any acceptable medical sources that plaintiff is functionally limited or unable to work. (TR. 16). The presence or absence of

functional limitations is an appropriate <u>Polaski</u> factor, and "[t]he lack of physical restrictions militates against a finding of total disability." <u>Hutton v. Apfel</u>, 175 F.3d 651, 655 (8th Cir. 1999)(citing <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993)).

The ALJ next stated that plaintiff has a poor work history. (Tr. 16). He stated that during the vocationally relevant past fifteen years, his earnings topped out at $5044 in 1994. (<u>Id.</u>). The AL noted that one month of supplemental security income at the full federal benefit rate would exceed his total earnings for 1992, 1993, 1996, and 1999-2007, and a year of supplemental security income would exceed what he earned in any of the vocationally relevant past fifteen years. (<u>Id.</u>). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. <u>See</u> <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996).

The ALJ noted that plaintiff does not take any prescription pain relief medication. (Tr. 16). A lack of strong pain medication is inconsistent with subjective complaints of disabling pain. <u>See</u> <u>Depover v. Barnhart</u>, 349 F.3d 563, 566 (8th Cir. 2003).

Finally, the ALJ pointed out that plaintiff has been noncompliant with treatment. (Tr. 17). Specifically, plaintiff continues to smoke despite being counseled about quitting and his history of pneumonia. (<u>Id.</u>). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. <u>See</u> <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 819 (8th Cir. 2003).

An administrative opinion must establish that the ALJ considered the appropriate factors. <u>See</u> <u>Holley v. Massanari</u>, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every <u>Polaski</u> factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. <u>See</u> <u>Dunahoo v. Apfel</u>, 241 F.3d 1033,

1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

2. **Residual Functional Capacity**

Plaintiff argues that the ALJ erred in formulating his residual functional capacity. Specifically, plaintiff contends that the ALJ failed to consider all of the medically determinable impairments contained in the record and formulated a residual functional capacity lacking any medical support.

After assessing plaintiff's credibility, the ALJ made the following determination regarding plaintiff's residual functional capacity:

> It is found that the claimant as a result of his combined impairments cannot engage in heavy or even medium work, but that he is not precluded from performing light work activities.  The claimant produced no evidence from a medically acceptable source documenting that light work activities are precluded.  There is no medical evidence documenting any limitations preventing the claimant from engaging in any of the exertional activities required in light work.  The claimant's testimony is the only evidence indicating that he cannot perform light work.  His testimony for the many reasons cited above is not credible.  With essentially normal x-rays of the claimant's right ankle, mild osteoarthritis in his other locations, fairly unremarkable physical examinations save for some findings in the right ankle area, no physician imposed functional limitations and minimal utilization of treatment and prescribed pain medication for musculoskeletal problems since filing for supplemental security income, this Administrative Law Judge finds that the evidence supports a finding that claimant has no limitations preventing him from standing and walking 6 of 8 work hours, sitting 6 of 8 work hours and lifting and carrying up to 20 pounds occasionally and 10 pounds frequently.  While it is very questionable whether his fairly minimal musculoskeletal abnormalities would result in significant exertional restrictions, he is HIV + and that would contribute to a limitation to light work.  Out of an excess of caution, it is also found that the claimant can only occasionally climb stairs and ramps but never ropes, scaffolds and ladders, and must avoid concentrated exposure to extreme cold hazardous heights and vibration.  His

nonsevere mental impairments do not result in any work related limitations.

(Tr. 17).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

Here, the ALJ indicated that his decision was based on the fact that plaintiff had essentially normal x-rays of his right ankle, mild osteoarthritis in his other locations, fairly unremarkable physical examinations and, no physician-imposed functional limitations. No physician, however, ever expressed an opinion on plaintiff's functional limitations. Although the ALJ indicates that the objective findings were minimal, plaintiff's most recent consultative examination with Dr. London revealed that plaintiff had an obvious deformity of the right ankle, plaintiff walked with a limp, plaintiff was unable to heel or toe walk or hop on his right leg, squatting was difficult for plaintiff, and plaintiff had some limitation of motion of the right ankle. (Tr. 436). Based on these findings alone, it is questionable whether plaintiff would be capable of standing and walking six

hours of an eight-hour workday.

Further, as the ALJ acknowledged, plaintiff is HIV positive and has mild osteoarthritis of the hands, wrists, and left elbow.  Plaintiff has also experienced frequent episodes of pneumonia and has been diagnosed with COPD.  (Tr. 506, 457).  Plaintiff was found to have wheezing, cough, and frequent pulmonary infections during a recent June 13, 2007 visit at St. John's Mercy Medical Center.  (Tr. 187-88).  It was noted that plaintiff was prescribed a Combivent inhaler for his COPD.  (Tr. 182).  The ALJ did not discuss plaintiff's COPD or indicate how it affects plaintiff's ability to work.

There is no opinion from any physician, treating or consulting, regarding plaintiff's ability to function in the workplace with his combination of impairments.  As such, there is no medical evidence in the record suggesting that plaintiff can, or cannot, perform light work.  At most, the ALJ determined what plaintiff can do based on the subjective complaints that the ALJ found credible, but the RFC must be based on some medical evidence; if there is no such evidence, the RFC "cannot be said to be supported by substantial evidence."  Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace.  See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  Here, the ALJ's physical residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence.  See Lauer, 245 F.3d at 703.

Plaintiff also argues that the hypothetical question presented to the vocational expert is flawed because it did not capture the concrete consequences of plaintiff's impairments.  The

undersigned has found that the residual functional capacity formulated by the ALJ is not supported by substantial evidence. The hypothetical question posed to the vocational expert was based upon this flawed residual functional capacity. Thus, the vocational expert's response to the hypothetical question likewise does not constitute substantial evidence supporting the ALJ's decision.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to order additional medical information addressing plaintiff's ability to function in the workplace, consider how plaintiff's COPD affects his ability to function in the workplace, and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record. The ALJ should then obtain further testimony from a vocational expert based on a properly formulated residual functional capacity

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C.

§ 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the

Commissioner for further proceedings consistent with this Report and Recommendation.


The parties are advised that they have fourteen (14) days in which to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an

extension of time for good cause is obtained, and that failure to file timely objections may result in

a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir.

1990).


Dated this __15th__ day of January, 2010.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE